**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1 1:20-CV-01195-CMA-MEH

QUINTON HOLDINGS, LLC, a Colorado Limited Liability Company,

        Plaintiff,
v.

AXYS GOLF LLC, a Florida Limited Liability Company, ERIC KAPLAN, an individual, MIND-2-MOTION, LLC, a Missouri Limited Liability Company, MIND2MOTION GOLF, LLC, a Missouri Limited Liability Company, MOTION MEMORY GOLF, LLC, a Missouri Limited Liability Company, and ALISON THIETJE, an individual,

        Defendants.

## DEFENDANTS AXYS GOLF LLC'S AND ERIC KAPLAN'S BRIEF REGARDING CHARLES QUINTON ONLINE ACTIVITIES

12244891.7

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................... 1

II.  FACTUAL BACKGROUND ................................................................................. 1
     A.   Eric Kaplan Discovers Golf Following Personal Tragedy ............................. 1
     B.   Mr. Kaplan Refines His Methods And Studies Biomechanics ...................... 2
     C.   Mr. Kaplan Founds AXYS And Begins To Teach PGA Champions ............ 3
     D.   Chuck Quinton Begins His Harassment Campaign ........................................ 4
     E.   Quinton's Teaching Methods Are Not His Own ............................................. 6
     F.   Mr. Kaplan Is Strung Along By Bad Faith Settlement Negotiations ............. 7

III. QUINTON'S DEFAMATORY, HARASSING CONDUCT MUST BE
     ENJOINED ............................................................................................................. 9
     A.   Defendants Will Succeed On A Defamation Claim ..................................... 10
     B.   Defendants Continue To Suffer Irreparable Harm ....................................... 12
     C.   The Balance Of Hardships Tilts Strongly In Favor Of Injunctive Relief ..... 13
     D.   Granting Injunctive Relief Is Within The Public Interest ............................. 14

IV.  CONCLUSION ..................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Begley v. Ireson*,
  399 P. 3d 777 (Colo. App. 2017) .................................................................................. 12

*Cache la Poudre Feeds, LLC v. Land O'Lakes, Inc.*,
  438 F. Supp. 2d. 1288 (D. Colo. 2006) ...................................................................... 12

*Gordon v. Boyles*,
  99 P. 3d 75 (Colo. App. 2004) ..................................................................................... 11

*Mondragon v. Adams County School District*,
  2017 WL 733317 (D. Colo. Feb. 24, 2017) ................................................................ 10

*Muhaisen v. Does 1 Through 100*,
  2017 WL 6945043 (D. Colo. Oct. 10, 2017).............................................................. 15

*POET, LLC v. Nelson Engineering, Inc.*,
  2018 WL 791254 (D.S.D. Feb. 7, 2018)..................................................................... 12

*Prairie Band of Potawatomi Indians v. Pierce*
  253 F. 3d 1234 (10th Cir. 2001)..................................................................................... 9

*Quigley v. Rosenthal*,
  43 F. Supp. 2d 1163 (D. Colo. 1999) .......................................................................... 11

*Seidl v. Greentree Mortgage Co.*,
  30 F. Supp. 2d 1292 (D. Colo. 1998) .......................................................................... 12

### STATUTES

17 U.S.C. § 102.................................................................................................................. 12

## I. INTRODUCTION

Pursuant to the Court's June 10, 2020 order, Defendants Eric Kaplan and Axys Golf, LLC ("Defendants") hereby submit this Brief regarding the scope of the warranted injunctive relief in this action. Particularly to the extent that Plaintiff Quinton Holdings, LLC ("Plaintiff") seeks to enjoin Defendants from defending themselves against the vicious attacks against them, each preliminary injunction factor weighs strongly in favor of enjoining Plaintiff from continuing its campaign of baseless harassment, disparagement, and defamation against Defendants. Accordingly, based on the facts and arguments set forth herein, Defendants respectfully request that the Court fashion relief that is equitable under the circumstances that exist.

## II. FACTUAL BACKGROUND

### A. Eric Kaplan Discovers Golf Following Personal Tragedy

Eric Kaplan has lived and breathed golf for more than 20 years. Declaration of Eric Kaplan, dated June 24, 2020 ("Kaplan Decl.") at ¶ 2. While he has competed at a high level as a player, his greatest success has come in teaching. *Id.* at ¶¶ 2-4. A PGA Tour teaching professional, Mr. Kaplan is the current coach to Bernhard Langer and Miguel Angel Jimenez, the #1 and #4 players, respectively, on the PGA Tour Champions rankings. *Id.* at ¶ 2. Since Mr. Kaplan's golf instruction program, AXYS Golf ("AXYS"), began operation in 2014, he has worked with additional PGA Tour golfers, including Adam Scott, Patrick Reed, Val Skinner, and Rory McIlroy. *Id.*

Mr. Kaplan's love of teaching was born out of personal tragedy. When Mr. Kaplan was five years old, his father was diagnosed with Parkinson's disease. *Id.* at ¶ 5.

1

Around this time, Mr. Kaplan was introduced to golf as a cathartic, therapeutic escape from the pain caused by his father's illness. *Id.* It soon became more.

Mr. Kaplan dreamed of using golf as therapy for those with Parkinson's. *Id.* at ¶ 5. Then, in 2000, he met Leonard Redlich, a golfer with Parkinson's. *Id.* at ¶ 6. Mr. Redlich was still golfing daily, but the disease made it difficult. Mr. Kaplan took notice, and they struck up a friendship. *Id.* at ¶¶ 7-8. Over time, Mr. Kaplan helped Mr. Redlich by imparting physical therapy techniques he had seen used with his father. *Id.* at ¶ 8. These proved beneficial, and allowed Mr. Redlich to play without falling. *Id.* Mr. Kaplan had his first student.

A further breakthrough came when Mr. Kaplan applied the techniques to people who did not suffer from Parkinson's and found that they saw similar benefits. *Id.* at ¶ 9.

### B. Mr. Kaplan Refines His Methods And Studies Biomechanics

As he taught more students, Mr. Kaplan researched additional ways to help people with Parkinson's play golf. *Id.* This led him to biomechanics, which involves analyzing the muscular, joint and skeletal actions of the body during the execution of a given task, skill, or technique. *Id.* at ¶ 12. Proper understanding of biomechanics can have a strong effect on performance, rehabilitation, and injury prevention. *Id.* It also can help one to master a skill (like swinging a golf club). *Id.* Biomechanics techniques for golf include, but are not limited to, (1) pulling small muscles on the right side of the body during the swing; (2) applying centripetal force to the swing; (3) tilting the spine away from the target on a downswing ("Secondary Tilt"); and (4) retracting the scapula to improve range of motion. *Id.*

Mr. Kaplan realized that the techniques he taught overlapped with biomechanics, which had been taught and discussed in connection with golf for nearly 80 years. *Id.* at ¶ 13. For example, these techniques appear in a book Mr. Kaplan studied, titled *A New Way To Better Golf*, published in 1932. *Id.* Mr. Redlich, recognizing the similarity between the 1932 book and Mr. Kaplan's lessons, gave Mr. Kaplan a copy in 2010, inscribing it "The bible before Kaplan." *Id.*, Ex. A. By this time, Mr. Kaplan had begun teaching professionally through the Eric Kaplan School of Golf under the guidance of PGA professional Phil Argianas. *Id.* at ¶ 11.

### C.  Mr. Kaplan Founds AXYS And Begins To Teach PGA Champions

In 2014, Mr. Kaplan began to study biomechanics with Dr. Richard Berger and Dr. Bill Cooney of the Mayo Clinic, as well as Dr. Sandra Doman, one of the top sports chiropractors in Florida. *Id.* at ¶ 14. Shortly thereafter, Mr. Kaplan founded AXYS. *Id.* Also in 2014, Mr. Kaplan began to work with two-time Masters® champion Bernhard Langer after meeting him at a charity event that Mr. Kaplan had organized, raising money for a leading foster care agency as well as Parkinson's research. *Id.* at ¶ 15. Langer was pleased with the results, and as word of mouth spread Mr. Kaplan worked with more professional golfers.[1] *Id.*

As of today, Mr. Kaplan has worked with or taught PGA golfers who collectively have 21 Major championships and 224 professional wins, and brought in more than

---

[1] Due to Mr. Langer's success, Mr. Kaplan primarily has become known as a putting expert, because that is what he and Mr. Langer initially focused on. The concepts Mr. Kaplan teaches, though, apply equally to the long game, and he has been teaching them in connection with all aspects as far back as 2000 with Mr. Redlich. *Id.* at ¶ 15.

$184,000,000 in career earnings. *Id.* And, by March 23, 2020, AXYS had grown to over 2,000 paying subscribers. *Id.* Mr. Kaplan believes, though, that the greatest measure of his success has come in his continued charity and philanthropic work—particularly as it relates to Parkinson's disease—because it has allowed him to give back to the golf community by channeling his struggles in life, and his personal tragedy, into empowering his students to overcome their own challenges. *Id.* at ¶ 16.

### D. Chuck Quinton Begins His Harassment Campaign

Mr. Kaplan's world was turned upside down on March 23, 2020, when out of nowhere (and in the midst of a pandemic) he received a threatening email from Chuck Quinton, founder of a competing golf instruction service called Rotary Swing that claims to have over 375,000 members. *Id.* at ¶¶ 17, 23, Ex. B. Quinton demanded Mr. Kaplan immediately remove all of his YouTube videos, claiming they contained Quinton's "copywritten" content that Mr. Kaplan was "illegally" using. *Id.* at ¶ 17, Ex. B. Quinton said he had an attorney and would sue for "MAXIMUM financial damages" if Mr. Kaplan did not comply that same day. *Id.* Quinton then menacingly said that he knew where Mr. Kaplan lived and intended to take everything he owned. *Id.*

Quinton next took to the Rotary Swing Facebook page (which has several thousand members) to exhort his fans to harass Mr. Kaplan and destroy his business:[2]

> Hey everyone, can you do me a favor? Please leave a comment on this
> dirt bag's youtube video (Erik Kaplan) who is plagiarizing my concepts for
> his own financial benefit to let others know this type of behavior is

---

[2] One fan said that Quinton had 3,000+ fans "willing to go blast [Mr. Kaplan's] videos with negative comments and put his ass right out of business." *Id.* at ¶ 19, Ex. C.

4

unethical, completely devoid of integrity and won't be tolerated[.]

*Id.* at ¶ 19, Ex. C. He said a lawsuit would benefit fans who helped harass Mr. Kaplan:

> How about after all the legal bills are paid, we take the rest of the money from the lawsuit and [Rotary Swing] members take over Pebble Beach for the day!

*Id.* Prolific commenter Douglas White was all too happy to oblige:

> Come on everyone, click the link and blast this fraud in the comments section!

*Id.* They proceeded to reply to positive YouTube comments with false statements. *Id.* ("You're welcome – he stole MY CONTENT"; "[T]his clown stole MY CONTENT"; "You probably should go over to the site from which he stole this material, RotarySwing.com").

In response to Quinton's threat of an imminent lawsuit, Mr. Kaplan removed some videos to placate him temporarily. *Id.* at ¶ 20. Quinton declared victory, thanking his fans ("You guys rock!") and characterizing this as a "blatant admission" of "guilt, general douchebaggery, zero ethics, [and] lack of character."[3] *Id.* at ¶ 20, Ex. D.

Quinton then posted a video on YouTube calling Mr. Kaplan a fraud and seeking credit for the success of Mr. Kaplan's PGA students. *Id.* at ¶ 21, Ex. E. He encouraged subscribers to "download and share" this video, which remains live on the Rotary Swing YouTube page with over 18,000 views.[4] *Id.* at ¶ 22, Ex. F. He also addressed Mr.

---

[3] Quinton even posted on the Facebook page that Mr. Kaplan fabricated his work with Parkinson's sufferers (to copy Quinton's story about working with stroke victims), in response to a fan's suggestion that Mr. Kaplan fabricated his father's illness to garner sympathy. *Id.* at ¶ 19, Ex. C.
[4] Defendants do not know, and have no way of knowing, how many of Quinton's fans,

5

Kaplan and said that he had contacted the General Manager of Mizner Country Club (where AXYS Golf Academy operates). *Id.* Quinton further warned Mr. Kaplan that the more he reacted the worse things would get, and vowed that if Mr. Kaplan tried to fight back, it would "just motivate [Quinton] even more."[5] *Id.*

Quinton next emailed the 375,000-person Rotary Swing email list to tell fans that they "may have been scammed by a complete <u>FRAUD</u> in the golf industry," linking to the video and imploring fans to see if they'd been a victim of "this charlatan's scam." *Id.* at ¶ 23, Ex. G.

Mr. Kaplan was horrified as Quinton's campaign proved effective. In the two days after Quinton's harassment began, AXYS lost 6% of its membership. *Id.* at ¶ 25. Within a week, nearly 12%. *Id.* ¶ 26. Negative comments continued to sprout up like weeds, and Mr. Kaplan struggled to respond to a wave of vitriolic attacks from Quinton and his army of trolls. *Id.*

### E. Quinton's Teaching Methods Are Not His Own

Quinton's attacks also were confusing: the techniques Quinton claimed he created were ***the same biomechanical concepts Mr. Kaplan and others had been studying and applying for years***. No one owns them. They are widely-discussed

---

with the promise of getting to play at Pebble Beach for free, downloaded and shared this video, much less how widely they may have done so.

[5] Quinton also alleged that Mr. Kaplan had been a member of Rotary Swing and was secretly pilfering content to repurpose as his own. Not so. Mr. Kaplan's research into biomechanics-based techniques included looking into third-party golf sites, including Mind2Motion, operated by defendant Alison Thietje, as well as Rotary Swing. Regardless, Mr. Kaplan did not become a member of Rotary Swing until after he began teaching the biomechanical techniques he currently employs. *Id.* at ¶ 24.

ideas and techniques that form the building blocks of an effective golf swing. *Id.* at ¶ 18.

Mr. Kaplan reached out to Alison Thietje, a biomechanics adherent with decades of experience applying the discipline to golf, who stated publicly that she had worked with and taught Quinton between 2008 and 2009 and entered into a one-sided contract with him relating to that work. *See id.* at ¶ 27-28, & Exs. H, I; *see also* FAC at ¶¶ 39-44. In 2007, Quinton had released a book advocating concepts diametrically opposed to the biomechanics fundamentals taught by Ms. Thietje—and which overlapped heavily with concepts taught by Mr. Kaplan and others. *Id.* at ¶¶ 27-29, Exs. H, I, J. Despite their contract, Quinton never paid Ms. Thietje,[6] then reinvented himself by claiming her teachings as his own, using her written material for his second book. *Id.* at ¶ 27-28, & Exs. H, I. Prior to the release of this new book, Quinton made sure his prior book (with its contradictory philosophy) was pulled from circulation. *Id.* at ¶ 29, Ex. J.

### F. Mr. Kaplan Is Strung Along By Bad Faith Settlement Negotiations

On March 25, 2020, Mr. Kaplan engaged counsel in the hope of resolving this meritless dispute and reversing the significant damage Quinton had done in two days. Declaration of Eleanor M. Lackman ("Lackman Decl.") at ¶ 2. Over the next month, counsel tried to reach a resolution with Quinton, who had threatened to imminently file a copyright suit. *Id.* These efforts were doomed from the start.

- Between March 25 and April 29, Quinton was represented by three different

---

[6] *See* Plaintiff's Motion for Temporary Restraining Order, ECF No. 13 at 9 (declaring there was "nothing to pay" Ms. Thietje's company for, but that she purportedly had been given "access and exposure" to Plaintiff's online platform and consumer Rolodex).

7

attorneys, two of whom were fired in the middle of negotiations.

- The first attorney delayed an initial call by nearly a week so he could "get up to speed," even though Quinton said he was imminently filing suit. *Id.* at ¶ 3-4.

- The second attorney (Sean Baker) abandoned Quinton's copyright claim; dismissed documentation showing Quinton's methods were unoriginal; falsely declared that the contract identifying the preexisting biomechanics concepts had no relevance and rejected requests to provide it;[7] and attempted to strong-arm Defendants into publishing a false statement that Quinton's material was "foundational and essential" to the full-swing instruction provided by Defendants. *Id.* at ¶¶ 5-9.

- Defendants learned on April 27—after Mr. Baker had been radio-silent for nearly two weeks—that Quinton had hired yet another attorney whose task was not to resolve but turn up the heat with a lawsuit. *Id.* at ¶ 10-11, Ex. B.

With no end in sight, Mr. Kaplan was frustrated that Quinton's falsehoods remained on the Internet, unchallenged and public, and feared further damage and losses. Kaplan Decl. at ¶ 30. Mr. Kaplan thus was forced to engage in self-help. *Id.* at ¶ 31. Accordingly, he created RotaryTruth.com, a website designed to tell his side of the story, which could be added as a link in response to online disparagement at the hands of Quinton's army. *Id.* The site is a necessary and specific corrective to the false

---

[7] Plaintiff took the contrary position in the Amended Complaint, asserting that Ms. Thietje made contributions but that they were subject to the contract's terms. Notice of Filing Amended Complaint (ECF No. 12-1 [Redline of Amended Complaint]), ¶¶ 39-45.

statements churned out by Quinton. *Id.* RotaryTruth.com went live on April 29, 2020. *Id.* at ¶ 31. This action was filed the same day. *See* Lackman Decl. ¶¶ 11-12.[8]

### III.     QUINTON'S DEFAMATORY, HARASSING CONDUCT MUST BE ENJOINED

A party seeking a preliminary injunction must show each of the following in order to obtain such relief: (1) it has a substantial likelihood of prevailing on the merits; (2) it will suffer irreparable harm unless the preliminary injunction is issued; (3) the threatened injury outweighs the harm the preliminary injunction might cause the opposing party; and (4) the preliminary injunction, if issued, will not adversely affect the public interest. *Prairie Band of Potawatomi Indians v. Pierce* 253 F. 3d 1234, 1246 (10th Cir. 2001).

At present, Defendants do not know the full extent of Quinton's efforts to destroy them. Kaplan Decl. ¶ 34. They certainly are aware of Quinton's inciting his fans to attack Mr. Kaplan online, as well as the direct threats Quinton made to Mr. Kaplan. But Defendants do not know who else Quinton has contacted or what else he has done; all they can conclude—given Quinton's pronouncement that removing material is an admission of guilt—is that the material persists. *Id.* Without disclosure, it is difficult to quantify the extent of the conduct to be enjoined. But, the conduct of which Defendants are aware involves brazen dissemination of false and defamatory statements made with the intent of bankrupting and ruining Mr. Kaplan solely to discredit and eliminate a fair competitor. *This* conduct should be enjoined, and to the extent Defendants must cease defending themselves, the ongoing damage from Quinton's attacks must be ameliorated

---

[8] The website was launched prior to Mr. Kaplan or counsel learning this action had been filed. Lackman Decl. at ¶ 12.

in some way. As set forth below, Defendants meet each of the four factors, including under the standard for a "disfavored" injunction.

### A. Defendants Will Succeed On A Defamation Claim

Based on Quinton's conduct, Defendants have multiple potential claims against Plaintiff, including for defamation.[9]  For multiple reasons, Quinton's ambush is so egregious that Defendants will succeed on the merits of this claim.

To prove defamation, a litigant must show that a party made (1) a defamatory statement about another, (2) published to a third party, (3) with the publisher's fault amounting to at least negligence, and (4) when a statement is not defamatory *per se*, the plaintiff must plead special damages. *Mondragon v. Adams County School District*, 2017 WL 733317, at *13 (D. Colo. Feb. 24, 2017). All of these elements are met.

Quinton's statements concerned Mr. Kaplan and were made to numerous individuals, including Rotary Swing and AXYS subscribers. Those statements—accusations that Mr. Kaplan is a fraud who stole Quinton's teaching methods—are provably false. Mr. Kaplan developed his methods over two decades by teaching individuals with Parkinson's and gradually incorporating concepts such as the secondary tilt, use of centripetal force, and pulling to the right side of the body. These techniques have been discussed for years, including by Ms. Thietje, who taught the

---

[9] Defendants believe that they may have other causes of action to assert that would bring about the desired result; a dismissal of Plaintiff's frivolous lawsuit alone would also suffice to demonstrate to the public that Quinton's threats were meritless. In light of the limited nature of this brief and in the interest of efficiency, Defendants will proceed with one claim.

10

same techniques to Quinton. Kaplan Decl. ¶¶ 27-29, Ex. H, I. Quinton then adopted the techniques and claimed he had created them. *Id.* None of these facts are disputed by Quinton in his motion or otherwise, thereby confirming that his claims are untrue.

Additionally, because Quinton's statements accuse Mr. Kaplan of behavior incompatible with his business (*i.e.*, a fraud has no place in the gentleman's game of golf), they are defamation *per se* and presumed harmful. *Gordon v. Boyles*, 99 P. 3d 75, 78–79 (Colo. App. 2004) (to be defamation *per se*, libelous statement directed at plaintiff must be on its face and without extrinsic proof unmistakably recognized as injurious). But even without that presumption, Quinton's false allegations have damaged Mr. Kaplan's reputation as a teacher dedicated to making golfers of all types, including those with physical challenges, better. Quantifiable harm also has occurred; after Quinton made these statements, AXYS lost 11.63% of its subscribers, and Mr. Kaplan received a deluge of negative messages and comments. Kaplan Decl. ¶ 26.

Most importantly, because Mr. Kaplan is not a public figure, Defendants only are required to show that Quinton's statements were negligent. *Quigley v. Rosenthal*, 43 F. Supp. 2d 1163, 1180-1181 (D. Colo. 1999). Given their obvious falsity, this standard easily is satisfied, as are higher standards such as malice, should Quinton claim Mr. Kaplan is a public figure (he is not).[10] Due to Quinton's professed stature, he surely knows that the techniques he claims as his own have been discussed and taught since long before he was born. He also does not dispute they were taught to him by Ms.

---

[10] Quinton, by contrast, purports to be a public figure. *See* FAC at ¶ 65.

11

Thietje, who taught them before she ever met Quinton. Thus, if Quinton is the expert he purports to be, he knew his statements were false.

The false material statements enjoy no privilege, including the litigation privilege. Under Colorado law, the litigation privilege does not protect "gratuitous statements posted on the Internet for the purpose of publicizing the case to persons who have no connection to the proceeding except as potentially interested observers." *Seidl v. Greentree Mortgage Co.*, 30 F. Supp. 2d 1292, 1315 (D. Colo. 1998); *POET, LLC v. Nelson Engineering, Inc.,* 2018 WL 791254 at *4 (D.S.D. Feb. 7, 2018) (same; applying Colorado law); *see also Cache la Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 438 F. Supp. 2d. 1288, 1295 (D. Colo. 2006) (applying to statements in brochure and press release distributed to public).[11]

### B.   Defendants Continue To Suffer Irreparable Harm

Defendants also have suffered irreparable harm as a result of Quinton's actions. As noted above, after Quinton's attacks began, Axys Golf lost 11.63% of its membership. More than half of that loss came in two days. The bleeding slowed once RotaryTruth went live, but Defendants continue to deal with the fallout from negative

---

[11] While not relevant to defamation, Quinton's emails to Mr. Kaplan also are not privileged. The privilege only attaches to pre-litigation communication (1) related to prospective litigation that is (2) contemplated in good faith. *Begley v. Ireson*, 399 P. 3d 777, 781 (Colo. App. 2017). The emails were neither. They related to a claim for copyright infringement that was quickly abandoned. *See* Lackman Decl. ¶¶ 2, 5, & Ex. A (citing 17 U.S.C. § 102 ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery[.]")).Quinton also certainly was aware that the methods he claims to own were discussed and taught at the very least by Alison Thietje long before he taught them. Quinton therefore knew he was pursuing a frivolous claim.

12

comments incited by Quinton. Kaplan Decl., ¶ 31. And this is only the conduct Defendants know about; the true extent of Quinton's efforts is unknown. Regardless, Defendants anticipate that if Quinton is allowed to proceed unchallenged, the amount and frequency of negative comments will increase, and AXYS will see additional cancellations. Due to the nature of the Internet, where statements are said to "live forever," Mr. Kaplan may be dealing with the consequences of Quinton's actions for a very long time. *Id.* at ¶ 34. Worse, Quinton has shown that when he wants to, he can reach hundreds of thousands of people and cause severe damage at the drop of a hat.

The irreparable nature of Defendants' 11.63% membership decline is even more apparent when compared to the "irreparable" harm allegedly caused to Quinton by RotaryTruth.com. In seeking "emergency" relief to remove the entire website, Plaintiff identified one Facebook comment from one subscriber stating he would be canceling his membership. One cancellation for a site with hundreds of thousands of members stands in stark contrast to the sudden loss of more than a tenth of a subscriber base.

### C.    The Balance Of Hardships Tilts Strongly In Favor Of Injunctive Relief

The balance of hardships weighs clearly in favor of enjoining Quinton's conduct. If an injunction does not issue, Quinton presumably will continue to make false statements and cajole subscribers to act as an Internet troll army. Even if Defendants defend themselves in the court of public opinion (a right Plaintiff is trying to take away through injunctive relief), they nonetheless will face an onslaught from Quinton and be forced to spend time responding to false accusations. Defendants need to run their business, court new customers, and retain existing ones, which is significantly more

13

difficult when false statements are being disseminated and cannot be challenged. And every time a defamatory comment is posted, it greatly hurts AXYS's advertising performance and revenue. Kaplan Decl. ¶ 26.

If an injunction does issue, Plaintiff will suffer no harm. Quinton merely would have to remove, and not further disseminate, falsehoods about Mr. Kaplan. A party does not have a right to defame others, nor to harass and intimidate. This is crucial, because Quinton's statements about Mr. Kaplan's "theft" are provably false ***by Plaintiff's own admission***. In seeking to have the entire website taken down, Plaintiff points to 12 "misrepresentations" yet is silent on everything else that tells Mr. Kaplan's side of the story, disproves Quinton's accusations, and highlights Quinton's intimidation efforts.[12]  Plaintiff does not challenge, for example, evidence showing that Quinton made menacing statements to Mr. Kaplan, incited subscribers to go after him, took his allegedly original teaching methods from golf biomechanics pioneer Alison Thietje and her lectures, and is trying to claim ownership over techniques and concepts that have been discussed and applied for several decades. Thus, the only conceivable "harm" Quinton could suffer would be to have his false accusations collapse.

### D. <ins>Granting Injunctive Relief Is Within The Public Interest</ins>

Enjoining Plaintiff also is within the public interest because it discourages the dissemination of false information and discourages use of legal threats to curtail

---

[12] Paragraph 33 of the Kaplan Decl. and Defendants' Opposition to Plaintiff's Motion for a Temporary Restraining Order (ECF No. 19) explain why these "misrepresentations" are immaterial.

14

competition. *Muhaisen v. Does 1 Through 100,* 2017 WL 6945043 at \*2-\*4 (D. Colo. Oct. 10, 2017) (injunction forcing defendant to remove libelous YouTube videos and website was in public interest because intentional lies do not materially advance society's interest in open debate of public issues). Quinton is not exercising free speech to impart information for purposes of protecting the public; he is spreading provable falsehoods solely to destroy a legitimate competitor. If not enjoined, Quinton may feel emboldened to go after other competitors.[13]

An injunction further is in the public interest because Quinton wants to monopolize teaching biomechanics in golf. This is no different than a lawyer trying to stop all others from practicing a specific area of law. Quinton has learned of a golf instruction method that works and wants to be the only one who can teach it—despite the fact that one legally cannot own a teaching method. This flies in the face of public policy, including the ability of businesses to compete fairly in the free market, and the ability of students of all types to access their preferred teaching instruction.[14]

## IV.   CONCLUSION

Defendants thank the Court for considering this issue, and respectfully request that the Court grant relief that is appropriate based on the facts and arguments herein.

---

[13] Comments on Rotary Swing's Facebook page indicate Quinton has gone after other competitors whom he says "stole" his methods. Kaplan Decl., ¶ 32, Ex. C.

[14] Should an injunction issue, Defendants should not be required to post a bond. Quinton has admitted Mr. Kaplan's story is true, aside from quibbles over minor details. As such, he has admitted his own claims are substantially without merit. Plaintiff thus would suffer no harm if forced to remove Quinton's comments and refrain from further activity.

15

Respectfully submitted

Dated: June 24, 2020

By: */s/ Eleanor M. Lackman*
Eleanor M. Lackman
Mitchell Silberberg & Knupp LLP
437 Madison Avenue, 25th Floor
New York, New York 10022
Telephone: (212) 509-3900
Facsimile: (212) 509-7239
eml@msk.com

*/s/ Carolyn Juarez*
Carolyn Juarez
Neugeboren O'Dowd PC
1227 Spruce Street, Suite 200
Boulder, Colorado 80302
Telephone: (720) 536-4900
Facsimile: (720) 536-4910
carolyn@nodiplaw.com

Attorneys for Defendants
AXYS GOLF LLC and ERIC KAPLAN

16

12244891.7

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via ECF to all counsel of record on this 24th day of June, 2020, with a courtesy copy sent by email to counsel for the following:

Brett Caban, Esq.
Aegis Law
601 S. Lindbergh
Frontenac, MO  63131
T: (314) 454-9100
bcaban@aegislaw.com

Attorneys for Defendants Alison Thietje, Mind-2-Motion, LLC, Mind2Motion Golf, LLC, and Motion Memory Golf, LLC

/s/    Carolyn Juarez